Filed 1/15/16  P. v. Rhoden CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048677 |
| v. | (Super. Ct. No. M10123) |
| LAWTIS DONALD RHODEN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard W. Luesebrink (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.), and Sheila F. Hanson, Judges.  Affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Alastair J. Agcaoili, Deputy Attorneys General, for Plaintiff and Respondent.

Lawtis Donald Rhoden appeals from a judgment after a jury concluded he was a sexually violent predator (SVP). Rhoden argues the following: (1) a trial judge erred by sua sponte continuing the case; (2) another trial judge erred by denying his motion to dismiss; (3) insufficient evidence supports the jury's finding he was an SVP; (4) there were numerous evidentiary errors; and (5) there was cumulative prejudicial error. As we explain below, we conclude one trial judge erred by continuing the case and a different trial judge made evidentiary errors but the errors were neither individually nor cumulatively prejudicial. Rhoden's other contentions are meritless, and we affirm the judgment.

FACTS

*Procedural History*

In January 2004, seven days before he was scheduled to be released, a petition alleged Rhoden was a sexually violent predator (Welf. & Inst. Code, § 6600 et seq.). In March 2006, after a hearing, the trial court found probable cause supported the petition. In November 2010, the trial court ordered a new probable cause hearing in light of *In re Ronje* (2009) 179 Cal.App.4th 509, disapproved in *Reilly v. Superior Court* (2013) 57 Cal.4th 641. In October 2011, after a hearing, the trial court again found probable cause supported the petition based in part on Dr. Dawn Starr's expert opinion. In February 2012, Starr again concluded Rhoden was an SVP but in February 2013 she changed her opinion, concluding Rhoden suffered a qualifying offense and had a mental disorder but that he was not likely to reoffend.

In early 2013, the parties filed numerous in limine motions while the matter was assigned to Judge Sheila F. Hanson. In March 2013, the case was transferred to Judge Richard W. Luesebrink for trial.

On the day jury trial was set to begin, Wednesday, May 1, 2013, the in limine motions were litigated before Judge Luesebrink. During the discussion of a motion, the prosecutor informed Judge Luesebrink that his expert, Starr, would not be

2

available to testify until May 16, 2013, at the earliest because a surgery prevented her from traveling. When Judge Luesebrink stated he was troubled Starr would not testify until after the prosecution rested, the prosecutor replied that at a hearing in March he informed the court of Starr's availability and defense counsel agreed to call witnesses out of order. The court stated, "No, I recall." The court added Rhoden's expert witnesses should have the opportunity to reply to Starr's testimony. The prosecutor said that had defense counsel not agreed to call witnesses out of order, the prosecution would have requested a continuance. Defense counsel was silent during this exchange.

After Judge Luesebrink discussed the exhibits and afforded defense counsel an opportunity to speak with Rhoden, defense counsel stated Rhoden was disappointed the prosecution was proceeding with the case. Counsel explained that in addition to his two experts who would testify Rhoden did not have a mental disorder and was not likely to reoffend, the prosecution's expert, Starr, would testify that although she believed Rhoden had a mental disorder, paraphilia NOS, she did not think Rhoden was likely to reoffend. Defense counsel orally moved to dismiss the petition. Judge Luesebrink analogized the situation to a motion for summary judgment and asked how the prosecutor intended to prove Rhoden was likely to reoffend. The prosecutor responded there was other evidence, the victims' testimony and expert testimony concerning mental disorders and actuarial tools assessing the likelihood of reoffending. After Judge Luesebrink and the prosecutor discussed whether the jury could conclude Rhoden was likely to reoffend despite the fact there was no expert testimony supporting that finding, the prosecutor stated there was case authority that held summary judgment was not available in SVP cases. Judge Luesebrink told counsel to return that afternoon to litigate the issue.

When proceedings resumed that afternoon, Judge Luesebrink indicated *Bagration v. Superior Court* (2003) 110 Cal.App.4th 1677 (*Bagration*), held summary judgment was not available in SVP proceedings. Judge Luesebrink explained there was a 10-day trial estimate and Starr was not available until May 16. He opined the prosecution

would have a difficult time proving Rhoden was likely to reoffend beyond a reasonable doubt. Judge Luesebrink asked defense counsel to discuss with Rhoden whether "he's willing to waive his due process right to a speedy trial." He also told defense counsel to "hit the books" and "explore how to present this issue in a pretrial proceeding." When defense counsel inquired whether trial was going to proceed, Judge Luesebrink stated it would be continued and sent the case back to Judge Hanson. Defense counsel stated Rhoden would rather proceed with trial. Judge Luesebrink responded: "Well, that may be true. But, you know, court resources are stretched." He added that there was a backlog of cases and it seemed premature to go "through all the preliminaries before addressing whether or not the [prosecution's] evidence is going to be satisfactory . . . until you've explored other alternatives." Defense counsel stated he was prepared to submit on the written expert reports and he was not willing to waive "Rhoden's right to a speedy trial."

After Judge Luesebrink said Rhoden did not have a right to a speedy trial, defense counsel said Rhoden had a right to a trial within a reasonable time and they were ready to proceed. Judge Luesebrink stated the following: "Well, I am not going to undertake this case in view of the delays until [May 16, 2013], which I agreed to. I will reset the matter. As I indicated before, I'm having knee replacement [June 3, 2013]. I'll be out all of June and July. So I'm going to reset the matter in front of Judge Hanson, from whence it came." Judge Luesebrink sent the case back to Judge Hanson, setting the matter on June 10, 2013. When defense counsel inquired whether he could send the case to Judge Hanson for the following day, Judge Luesebrink denied the request stating that allowing trial to proceed "would be a terrible misuse of court time and attorney time." He added continuing trial to June 10 would "give [counsel] ample time to exhaust any further research or effort to present the case prior to that time."

The next day, on May 2, 2013, Rhoden filed a nonstatutory motion to dismiss supported by reports from Marianne Davis, Preston Sims, and Starr, none of

4

whom concluded Rhoden was likely to reoffend. Rhoden argued the trial court must dismiss the petition because there was no evidence he was an SVP. The prosecution opposed the motion, arguing Rhoden's motion although entitled a nonstatutory motion to dismiss was in fact a summary judgment motion, which was prohibited in SVP cases.

There was a hearing before Judge Hanson on May 17, 2013. Defense counsel argued Judge Hanson should dismiss the case because there was no expert testimony Rhoden met all the SVP criteria. Judge Hanson denied the motion both on the merits and on procedural grounds.[1] Based on *Bagration, supra,* 110 Cal.App.4th 1677, and *Gray v. Superior Court* (2002) 95 Cal.App.4th 322 (*Gray*), Judge Hanson explained a nonstatutory motion to dismiss was unavailable in SVP cases because the SVP petition was properly filed, granting the trial court jurisdiction, and the court had found probable cause to proceed to trial. Judge Hanson stated she did not have legal authority to rule on the weight of the prosecutor's evidence and the issue of whether Rhoden was an SVP "should be left to the trier of fact" unless the prosecutor dismissed the case.

There were additional hearings on June 17 and 18, 2013, before Judge Hanson to litigate previously filed in limine motions. As relevant here, the prosecution moved to limit the testimony of Dr. Brian Abbott pursuant to *People v. Campos* (1995) 32 Cal.App.4th 304 (*Campos*). The prosecutor argued an expert may, in offering an opinion, state she relied on out-of-court statements, but the expert may not testify to the out-of-court statements for their truth. Rhoden opposed the motion in a rather conclusory fashion. At the hearing on the motion, the trial court engaged in a lengthy discussion about its practice of allowing experts to testify to hearsay in the form of statistical analysis but not to hearsay in the form of other doctors' opinions. Relying

---

[1] The Attorney General abandons the procedural argument because the prosecutor filed written opposition and appeared at the hearing to argue the motion. (*Tate v. Superior Court* (1975) 45 Cal.App.3d 925, 930 [appearance of party cures defects in notice].)

5

on *Campos*, the court concluded Abbott could testify to studies he considered but he could not testify to the opinions of the authors of the studies when offering his opinion.

Additionally, the prosecution moved to exclude any reference to the conditional release program (CONREP) on relevance grounds because the jury was not permitted to consider the consequences of its verdict. Rhoden responded with one sentence, "It will be impossible not to reference [CONREP] and [c]onditional [r]elease, unless [the prosecution] is willing to forego discussing treatment at Coalinga entirely." At the hearing, after the prosecutor argued he sought to exclude any reference to the consequences of the jury's verdict, defense counsel replied the jury needed to be aware of the treatment phases and that Rhoden completed all the phases and was ready for CONREP. The court agreed defense counsel could offer evidence Rhoden completed treatment but evidence of the verdict's consequences, CONREP, was not relevant. The court granted the prosecution's motion, ruling defense counsel could introduce evidence of Rhoden's treatment but could not introduce evidence "concerning what would happen after commitment or any reference to CONREP or conditional release and how that would play should [Rhoden] be committed."

*Trial*

*Prosecution Evidence*

Testimony began on Monday, June 24, 2013, before Judge Hanson, six weeks after Judge Luesebrink continued the case on the day trial was set to begin. That morning, out of the jury's presence, the prosecutor informed the trial court, Judge Hanson, that on the previous Thursday, June 20, 2013, he found a website apparently created by Rhoden advertising a paralegal business. The prosecutor stated he informed Starr of the website, Starr reviewed the website, and Starr changed her opinion to now conclude Rhoden was likely to reoffend and was an SVP. Defense counsel objected to Starr relying on the website on due process grounds, among others. The court overruled counsel's objection and reopened discovery, allowing Starr to consider the

6

website.  Rhoden and his defense counsel waived any request for additional time or discovery, or a request for a mistrial.

*Offenses*

In June 1966, Frances B. met Rhoden at a party and agreed to walk with him through a nearby university campus.  As they walked by a construction site, Rhoden pulled out a knife, held it to her throat, and threatened to hurt her unless she followed his instructions.  He forced her into the construction site and told her to remove her clothes.  He held the knife to her throat as he raped her.  He later walked her back to her apartment.  Frances filed a police report and subsequently identified Rhoden in a lineup.  After speaking with the district attorney, however, she decided not to press charges because she was ashamed and did not believe the district attorney supported her.

In April 1984, 14-year-old Tina S. was walking to school when Rhoden, who was in his early 30's, drove his car in front of her and blocked her path.  Through the driver's side window, Rhoden told her that he was a photographer and asked her if he could take modeling photographs of her.  She refused and tried to walk around his car.  Rhoden got out of his car, grabbed her arm, and pulled her into the car.  Tina tried to escape, but Rhoden locked the doors and drove to a secluded parking structure.  Rhoden raped Tina.  As he did, Tina cried and told him to stop, but Rhoden said, "Shut up and just let me finish."  Later, Rhoden drove Tina to school and gave her $40.  Rhoden subsequently pleaded guilty to forcible rape charges.

In June 1984, 17-year old Christina S. was walking home when Rhoden drove his car next to her on the street.  As he sat in the car, Rhoden asked her if she was interested in taking modeling photographs with him.  Christina got into his car, and he drove to a secluded carport.  Rhoden raped Christina.  Later, Rhoden drove her back to the street and gave her $20.  A jury convicted Rhoden of rape by force, forceful sexual penetration, and sexual battery.

In June 1984, 14-year-old Kathryn L. was walking home when Rhoden drove his car next to her and motioned for her to speak with him. Kathryn initially refused but eventually acquiesced when Rhoden called out to her. Rhoden told Kathryn that he was a photographer and asked if she wanted to participate in a modeling photo shoot. Rhoden's girlfriend, who was in the car, encouraged Kathryn to participate. Kathryn agreed, and Rhoden drove to a supermarket parking lot where his girlfriend got out of the car. He drove away with Kathryn. At a stoplight, Kathryn reached for the door handle to escape, but Rhoden said, "'I wouldn't do that if I were you.'" Kathryn felt threatened and remained in the car. Rhoden drove to a secluded area. Rhoden leaned Kathryn against the car door and raped her. When she told him to stop and tried to push him off, Rhoden said, "'Just let me finish.'" Later, Rhoden drove Kathryn to a street near her house and gave her $20. A jury convicted Rhoden of forcible rape.

In December 1984, 13-year-old Kimberly W. met Rhoden in a motel room to take part in what she believed was a modeling photo shoot. Rhoden took several photographs of Kimberly in lingerie. He performed oral sex on her and raped her. During the rape, Kimberly repeatedly told him to stop and at one point kicked him. He masturbated and ejaculated onto her. Afterwards, Rhoden promised to buy Kimberly a computer if she agreed not to tell her mother what he had done to her. A jury convicted Rhoden of rape and use of a minor for obscene purposes.

*Expert Testimony*[2]

Starr was a licensed psychologist who had practiced since 1987 and had conducted approximately 1,700 SVP evaluations since 1996. In the previous seven years, Starr concluded 80 to 90 percent of the people she evaluated were not SVP's. She evaluated Rhoden for the first time in 2002 and subsequently interviewed him seven times, the most recent time in January 2013.

---

[2] Rhoden's numerous evidentiary claims require us to provide significant portions of the trial court proceedings.

Starr explained Rhoden had the requisite qualifying offenses, including the April 1984 sexual assault of Tina, the June 1984 sexual assault of Christina, the June 1984 sexual assault of Kathryn, and the December 1984 sexual assault of Kimberly. Starr also considered the June 1966 sexual assault of Frances and a 1968 incident where 18-year-old Rhoden had sexual intercourse with a 13-year-old girl three times and impregnated her.

Starr diagnosed Rhoden with a mental disorder, paraphilia not otherwise specified (NOS) and a personality disorder with both antisocial and narcissistic features. She based her opinion on multiple personal interviews with him and a variety of documents, including probation reports, police reports, depositions, victims' testimony, his wife's and former girlfriend's statements, and his treatment file from Coalinga State Hospital (Coalinga), where he had been in custody since 2003.

Starr explained paraphilia requires the person to have "recurrent, intense, sexually arousing urges, fantasies, or behaviors generally directed towards non-consenting persons." She acknowledged the debate in the psychological community over the validity of paraphilia NOS, but she believed it was a valid diagnosis used in the rare circumstance where a male has recurrent sexual urges towards non-consenting women despite the consequences. Her testimony continued:

"[Starr]: In all states where they have [an] SVP statute that diagnosis has been rendered and upheld. There are some people who are against it for political reasons. Legal --

"[Defense counsel]: Objection. Calls for improper opinion.

"[Trial court]: Overruled.

"[Starr]: Political reasons, legal reasons. Academic reasons. [¶] Many of those are people who are not in favor of civil commitments, like an SVP law.

"[Defense counsel]: Objection. Lack of foundation and calls for speculation and move to strike. Again, improper opinion.

9

"[Trial court]: Sustained."

Starr added the diagnosis was appropriate for Rhoden because of the age of onset, the string of incidents in 1984, the use of a ruse to lure his victims, the fact most males do not maintain sexual arousal with a non-consensual partner, he had other willing sexual partners during the time, and his subsequent insistence the encounters were consensual. She defined a personality disorder as "an enduring personality pattern or trait that deviates markedly from the person's culture and expectations and often creates distress or problems for themselves or other people."

Starr opined Rhoden currently suffered from paraphilia NOS and a personality disorder. She expounded on the antisocial components of his personality disorder, including lying, operating a website, results of a psycopathy evaluation, his personal letters, and interviews. She said that in 2002 or 2003, despite having completed sex offender treatment while incarcerated in Tennessee, Rhoden lied about what he had done and minimized his conduct. She stated he was more honest but he is very smart and arrogant, and has not "really come clean." She continued:

"[Starr]: Another example would be just recently as recently as last Friday he was found to be operating a website as a paralegal.

"[Defense counsel]: Objection. Calls for speculation. And lack of foundation.

"[Trial court]: Overruled.

"[Starr]: I saw the website and I listened to his voice, which is very distinctive. It was on both of the phone numbers. And the hospital does not allow patients to have Internet access. They don't allow them to have cell phones. And he's using an alias there. And in his past he's used . . . scores of aliases. So this goes to me to be a continuing pattern of his deceitfulness, his manipulation, his arrogance . . . ." She added this was how Rhoden manipulated Coalinga staff.

10

Starr explained that in 2011 a patient refused to assist Rhoden and he became angry and his behavior matched how he treated his victims, wife, and girlfriend. She stated he feels "better than other people, smarter, and he deserves preferential treatment." She added that in 2011 he persuaded other patients to cut his hair and fix his computer in violation of prison rules, which illustrates his belief "he is entitled to preferential treatment." She continued:

"[Starr]: And it flies in the face of his supposedly working in therapy in such a way that -- he has been passed through up each of the levels very quickly with no real regard for some of this continued evidence of his diagnosed mental disorder.

"[Defense counsel]: Objection. That['s] lacking in foundation. Calls for speculation --

"[Court reporter]: I'm sorry. You need to slow down.

"[Defense counsel]: Calls for speculation as to her opinion as to how . . . Rhoden progressed through the phases at Coalinga.

"[Trial court]: Overruled. She may give her opinions."

Starr stated Rhoden's deceitfulness was further illustrated by an incident in 2011 when staff searched his room and found numerous prohibited items. She said although the items were "minor," the fact he possessed them in violation of the rules demonstrates he manipulates the system.

When presented with the prosecutor's exhibit No. 36, Starr testified it was a printout from the "Donald Allen . . . Rhoden . . . freelance litigation paralegal" website. She stated the website listed two telephone numbers, a Sun City address but an Encino Zip code, and recommendations from three attorneys. When the prosecutor asked Starr whether she relied on the website in forming her opinion, the following colloquy occurred:

"[Starr]: Correct. I've never seen anybody ever have a website of any patient at the state hospitals.

11

"[Defense counsel]:  I'm going to object as that lacks foundation.  Calls for speculation.  Move to strike.

"[Trial court]:  Overruled.

"[Prosecutor]:  What about this website tells you that he's being deceitful or manipulative?

"[Defense counsel]:  I'm going to object again.  Calls for speculation and lack of foundation as to whether or not . . . Rhoden is the author or had anything to do with this website.

"[Trial court]:  Overruled."

Starr testified she called both telephone numbers and concluded Rhoden left the messages because he has a distinctive voice.  She explained his deceit was illustrated by the fact he was again using an alias and he did not inform people he lives at Coalinga.

After the trial court overruled defense counsel's objections (speculation & lack of foundation) to Starr's testimony why Rhoden used a different name, the following colloquy occurred:

"[Starr]:  I confirmed when I was there doing an update on Friday that Internet and cell phone access are not allowed.

"[Defense counsel]:  Objection.  Hearsay.

"[Trial court]:  Overruled.

"[Starr]:  And so this kind of operation is clearly flying in the face of supposedly being a rule compliant person, and he's just, again, doing whatever he wants behind the scenes.

"[Defense counsel]:  Objection.  Argumentative.  Calls for speculation.  Lack of foundation.

"[Trial court]:  Overruled."

12

Starr repeated the address on the website was for Sun City and the Zip code for Encino but Rhoden was a full-time resident at Coalinga.

Starr testified concerning Gary Anderson, an attorney in Tennessee who assisted Rhoden and hired him to perform paralegal work.

Starr stated she evaluated Rhoden on the PCL-R test, a psychopathy checklist where a score of over 30 or 32 is considered severe psychopathy; Rhoden scored a 33. She opined Rhoden was a psychopath someone who would engage in violent criminal conduct to victimize others for personal gain. She said that although Rhoden initially believed he engaged in consensual sex with the victims, more recently he admitted he was addicted to sex and gambling.

Starr said Rhoden's 2005 letters to his ex-wife demonstrate his controlling and deceitful personality. Rhoden belittled her about her weight and instructed her to lie to help secure his release, including lying about or delaying divorce because it would benefit him if he had someone who could assist him when he was released. Rhoden also asked her to buy lottery tickets with specific numbers.

Starr opined Rhoden's two disorders, paraphilia NOS and personality disorder with both antisocial and narcissistic features, individually caused him to suffer from volitional impairment that predisposed him to commit sexually violent offenses. She added that when they are combined, "it's like putting gasoline on a fire." Starr thus opined Rhoden had a diagnosed mental disorder.

When the prosecutor began to inquire of Starr whether Rhoden was likely to reoffend, Rhoden's defense counsel objected. In a reported discussion outside the jury's presence, counsel stated that just three days earlier, Starr was of the opinion Rhoden was not likely to reoffend but changed her mind mid-trial after seeing his paralegal website even though discovery was closed. When the trial court reminded counsel discovery was reopened, counsel noted that was over his objection. Counsel

13

renewed his objection to the reopening of discovery, Starr considering the website, and Starr changing her opinion mid-trial. The trial court overruled the objections.

When testimony resumed, Starr explained that during her first seven evaluations and as recently as 2012 she concluded Rhoden was likely to reoffend; she testified at the 2006 and 2011 probable cause hearings. She added that during her January 2013 evaluation, she concluded he was not likely to reoffend. She opined however she now considers Rhoden likely to reoffend because his website demonstrates he has "gamed . . . the system." She explained Rhoden has convinced his treatment team he is ready to be released but he continues to manipulate and deceive. The following colloquy occurred:

"[Starr]: Click on there, there's a team who appears to have helped establish the website. It has his contact information. His voice. And he's blatantly breaking the rules at the hospital by having Internet access and phone access.

"[Defense counsel]: I'm going to object. That's calling for speculation as to whether or not . . . Rhoden has access to the Internet.

"[Trial court]: Overruled.

"[Starr]: And so [it] just shows me he's doing what he's always done. On the surface try to look like a good guy or justify why he's okay, but underneath --

"[Defense counsel]: Objection. Calls for speculation and lack of foundation. Move to strike.

"[Trial court]: Overruled.

"[Starr]: -- He's still [exhibiting] the same old behaviors that were part and parcel of a sexual offending."

Starr continued that had she been aware of his website in January 2013, she would have concluded he was likely to reoffend. Starr stated she also used actuarial tools to determine whether he was likely to reoffend. She explained Rhoden scored a four on the Static-99R, the most widely used and accepted actuarial tool in predicting sexual

14

recidivism, which meant he had a reoffense rate of 20 percent after five years and 30 percent after 10 years, the "moderate high range." She also said Rhoden scored a four on the Static-2002R, another widely accepted actuarial tool, which meant he had a reoffense rate of 16 percent after five years and 26 percent after 10 years, the "low moderate range." She stated Rhoden scored 3.75 on the Structured Risk Assessment Forensic Version (SRA-FV), a well-established risk assessment tool that measures sexual interest in children, which placed him in the "high range." Starr also noted he did not qualify for any "protective factors," such as being over age 70, having health issues, or having completed sex offender treatment but she did give him "the benefit of the doubt" on a number of the categories. She did consider his age of 63 in determining his scores on the actuarial tests. Starr explained the actuarial tools, while rigorous, tend to underestimate the likelihood of reoffense because many sexual offenses go unreported.

Starr opined Rhoden was not amenable to voluntary treatment in the community because he did not think he needed treatment and he had a good release plan. She elaborated that Rhoden "manufactur[ed]" and "falsif[ied]" his release plan, including the falsifying of documents. On one occasion, Rhoden had another patient who had the same last name as the warden write a letter requesting the district attorney not prosecute Rhoden because he was rehabilitated. Starr said Rhoden would not undergo voluntary treatment because the court would not order him to do so "and he has no parole time." After a brief discussion with counsel out of the jury's presence, the trial court ordered the jury to not consider Starr's testimony Rhoden would not be on parole and it struck that portion of the answer. Starr opined Rhoden was likely to reoffend and he currently qualified as an SVP.

On cross-examination, Starr testified the sex offender treatment program consisted of five phases with the fifth phase being community placement. The trial court sustained the prosecutor's objection and struck the answer. She stated that according to Coalinga staff Rhoden had completed the first four phases and records indicated he was

15

suitable for release. When defense counsel attempted to question Starr about whether she agreed with other evaluations, the trial court sustained the prosecutor's relevancy objection. Starr acknowledged that in January 2013 she concluded Rhoden was not an SVP because the information indicated he was not having any continuing issues involving manipulation, deceitfulness, or antisocial behavior and his release plans suggested he could be safely released, although "[her] gut feeling was that there was still something nefarious going on and that he met the criteria, but [she] had no evidence of . . . that." Starr admitted she had not met with Rhoden since that time and she changed her opinion because of the website, his voice mail recordings, his alias, and the false address. Starr conceded that up until three days before she testified, she still believed Rhoden was not an SVP.

When defense counsel asked Starr whether she had spoken with other mental health professionals, the following colloquy occurred:

"[Defense counsel]: So Dr. [Stephanie] Brazier is of the opinion that . . . Rhoden can be safely released into the community; is that correct?

"[Prosecutor]: Objection, your honor. Calls for hearsay.

"[Trial court]: Sustained.

"[Defense counsel]: Do you agree with the opinions of [Timothy] Grace?

"[Prosecutor]: Objection, your honor. Relevance.

"[Trial court]: Sustained."

Later, Starr testified Rhoden did have a background doing criminal paralegal work. She could not say whether he made any misrepresentations concerning the paralegal work he did but he did create the false appearance he operated a paralegal business in the community. She added he violated prison rules by having access to the Internet and a phone that could record a message.

When defense counsel asked Starr how she knew Rhoden created the website, the following colloquy occurred:

16

"[Defense counsel]: Well, how do you know . . . Rhoden created that website?

"[Prosecutor]: Objection, your honor. Asked and answered.

"[Trial court]: Sustained.

"[Defense counsel]: Do you know when the website was created?

"[Starr]: The copyright says 2012.

"[Defense counsel]: Do you know who created it?

"[Prosecutor]: Objection, your honor. Asked and answered.

"[Trial court]: Sustained.

"[Defense counsel]: Do you know if . . . Rhoden was responsible for creating it?

"[Prosecutor]: Objection, your honor. Asked and answered.

"[Trial court]: Sustained."

After Starr testified that at the time patients at Coalinga could have a computer and access to legal pornography, the following colloquy occurred:

"[Defense counsel]: But you have no evidence that . . . Rhoden did have access to the Internet, do you?

"[Prosecutor]: Objection, your honor. Asked and answered.

"[Trial court]: Sustained."

Starr concluded Rhoden had Internet access because of the website.

Defense counsel asked Starr about Rhoden's experience as a paralegal and Anderson's praise of Rhoden's legal skills. The following colloquy occurred:

"[Defense counsel]: Do you have any reason to disagree with those representations by . . . Anderson?

"[Prosecutor]: Objection. Irrelevant.

"[Trial court]: Sustained.

"[Defense counsel]: He indicates, '[Rhoden] is confident, dependable and very effective with every legal project that he works on.'

"[Prosecutor]: Objection, your honor. Relevance.

"[Trial court]: Sustained.

"[Defense counsel]: I'd like to be heard.

"[Trial court]: Why don't you move on. At our break you may be heard."

At a break out of the jury's presence, the trial court inquired of defense counsel why he wished to be heard. Defense counsel explained he wanted to examine Starr about other information on the website to establish the totality of its information was truthful and accurate. The trial court indicated it was not inclined to allow counsel to question Starr about every representation made on the website but he was free to make that argument to the jury. The court indicated it would rule on a question by question basis.

When testimony resumed, defense counsel asked Starr whether there was anything deceptive about the "frequently asked question" portion of the website. The trial court sustained the prosecutor's asked and answered objection.

Defense counsel questioned Starr about the DSM-IV and paraphilia NOS, including that the chairperson of the DSM-IV task force, Dr. Allen Frances, was critical of the paraphilia NOS diagnosis. The following colloquy occurred:

"[Defense counsel]: Prior to the publication of the DSM-[V], critics such as . . . Frances emphasized that state evaluators were overusing the paraphilia NOS diagnosis?

"[Prosecutor]: Objection, your honor. Calls for hearsay. Lack of foundation. Relevance.

"[Defense counsel]: She knows.

"[Trial court]: Hold on. I think it's more of a *Campos* issue; is that correct?

18

"[Prosecutor]: I didn't hear you.

"[Trial court]: *Campos*?

"[Prosecutor]: Yes, your honor.

"[Trial court]: Sustained."

Defense counsel questioned Starr about the recent publication of the DSM-V and whether its definition of paraphilia NOS more restrictive than the DSM-IV; Starr disagreed it was more restrictive. Counsel asked Starr whether she updated her diagnosis of Rhoden in light of the DSM-V, and the following colloquy occurred:

"[Starr]: No. I'm not allowed to independently pull a file and start working on a case unless I am asked to do so by the court or by the district attorney's office by statute. I can't just *willy nilly* pull out a file and decide I'm going to change the diagnosis or do a new kind of risk assessment or contact staff or something like that.

"[Defense counsel]: Isn't that what you did right here with this website, *willy nilly* pull something out to change your diagnosis?

"[Prosecutor]: Objection, your honor. Argumentative.

"[Trial court]: Sustained. [¶] Counsel, I'll admonish you." (Italics added.)

Starr acknowledged paraphilia NOS was a rare diagnosis. She explained the deceit and manipulation were relevant to the diagnosis in how he lured the victims into his car under the pretense he was a professional photographer.

When defense counsel asked Starr whether there was any evidence the paraphilia NOS impaired his occupation, Starr responded Rhoden did not want to work at the hospital because of the pay. After Starr stated it was her opinion Rhoden was not a model patient, the following colloquy occurred:

"[Defense counsel]: So the doctors that do have [daily interactions with Rhoden] concluded that he's a model patient; is that correct?

"[Prosecutor]: Objection, your honor. Calls for hearsay. *Campos*.

19

"[Trial court]: Sustained."

When defense counsel asked Starr which of Rhoden's statements she relied on to arrive at the paraphilia NOS diagnosis, Starr asked whether he wanted her to go through her "whole 200[-]page report. After Starr cited to one example, she said "there's 240 pages to go." Starr began to answer in narrative form when the trial court interrupted and said defense counsel asked her to relate every statement and unless he withdrew the question, she was still answering. Defense counsel was silent, and Starr continued. When Starr stopped and defense counsel began to ask a question, the trial court interjected and reminded counsel Starr was not done answering unless counsel wanted to withdraw the question. Counsel replied, "Not at this time." Starr continued with her answer. When counsel interjected he did want Starr to continue, but he also wanted to ask questions, the trial court said no because she could only answer one question at a time. Defense counsel said, "Okay." Starr continued. Later when counsel interjected again, the trial court asked whether he was withdrawing the question, and counsel replied he was. After Starr agreed she had reviewed Dr. Christine Cardin's reports, including her diagnosis Rhoden suffered from mild to moderate depression, the following colloquy occurred:

"[Defense counsel]: But, doctor, you indicated in your report when you were reviewing . . . Cardin that there was a diagnosis of adjustment disorder with mixed anxiety; is that correct?

"[Trial court]: Counsel, the court is going to interpose its own objection under *Campos*. [¶] Will you please approach." After an unreported discussion, defense counsel's cross-examination continued.

After Starr confirmed she had reviewed Rhoden's psychiatric reports, the following colloquy occurred:

"[Defense counsel]: There was no indication in . . . Rhoden's Coalinga file that he had ever been diagnosed by anyone at Coalinga with paraphilia NOS; correct?

20

"[Prosecutor]: Your honor, I'm going to object at this time. Calls for speculation. *Campos*. Relevancy.

"[Trial court]: Sustained.

"[Defense counsel]: Doctor, you reviewed records regarding the earlier Tennessee arrest and conviction; is that correct?

"[Starr]: Yes.

"[Defense counsel]: And those records never reflected a diagnosis of paraphilia NOS; correct?

"[Prosecutor]: Same objection, your honor. Relevancy. Calls for improper hearsay and *Campos*.

"[Trial court]: Sustained."

Later, when defense counsel asked Starr whether she was familiar with a study conducted by Jack Vognsen and Amy Phenix, the following colloquy occurred:

"[Starr]: Yes, I'm familiar. I know both of them are on the SVP panel or they were.

"[Defense counsel]: And did they indicate that an antisocial personality disorder --

"[Prosecutor]: Your honor, I'm going to object at this point as calling for hearsay and *Campos*.

"[Trial court]: At this point in time I'm going to sustain the objection."

The parties stipulated Davis's August 2012 report could be read into the record. Davis found Rhoden had suffered a qualifying offense but that he did not suffer from a mental disorder and he was not likely to engage in sexually violent criminal behavior. After detailing Rhoden's qualifying offenses, Davis detailed Rhoden's non-sexual misconduct, including sending harassing letters and cards to attorneys, victims, and jurors involved in his prior cases and the attempted forgery of a letter from the warden. Davis stated Rhoden completed a sex offender treatment program in a

21

Tennessee prison and beginning in 2004 he had been in a sex offender treatment program while incarcerated in California. He arranged for outpatient treatment in Florida to continue his treatment if released. Davis diagnosed Rhoden with antisocial personality disorder with narcissistic features. However, she rejected a paraphilia NOS diagnosis because she saw no evidence he was aroused by non-consensual sexual activity or his victims' suffering or distress. Davis therefore concluded Rhoden did not suffer from a diagnosed mental disorder. With respect to whether Rhoden was likely to engage in sexually violent criminal behavior, Davis explained Rhoden scored a three on the Static-99R, which meant he was in the moderate low range for reoffending with a 16 percent chance in five years and a 24 percent chance in 10 years. Davis opined that because Rhoden had family support and he would continue with voluntary treatment, Rhoden's risk of reoffending was "in the low, moderate range." Davis thus concluded Rhoden did not suffer from a mental disorder and consequently could not be considered likely to reoffend. Davis was of the opinion Rhoden was not an SVP.

G. Preston Sims, a Department of State Hospitals employee, evaluated Rhoden in July 2012. Sims stated he was not aware of Rhoden's paralegal website when he evaluated him. Sims testified Rhoden committed the requisite qualifying offenses and he suffered from an extreme version of antisocial personality disorder, and he was highly psychopathic. Sims explained that although this diagnosis could qualify someone for commitment as an SVP "in extremely rare cases," Rhoden was not one of those cases because he was predisposed to commit any number of crimes not just sexual crimes. Sims testified concerning Rhoden's scores, four, on the Static-99R and the Static-2002R tests and acknowledged a dispute whether recidivism rates are overestimated or underestimated without offering an opinion. He added a person who scores high for psychopathy has a higher risk to sexually reoffend.

On cross-examination, Sims testified Rhoden committed the qualifying sexual offenses but he did not have a mental disorder because he was not predisposed to

22

commit only sexual offenses. Sims added Rhoden had a comprehensive release plan. After Sims opined Rhoden did not suffer from a mental disorder, the following colloquy occurred:

"[Defense counsel]: Could I ask you what materials you considered in reaching that conclusion?

"[Sims]: Sure. Well, the first and the easiest one is there's an article in the American Academy of Psychiatry.

"[Defense counsel]: Do you have the article with you, doctor?

"[Sims]: I hope I do. I think I just -- American Academy of Forensic Psychiatry, I think it is, from 2008 by [Michael] First and [Robert] Halon, . . . which talks about --

"[Prosecutor]: Your honor, I'm going to object. Calls for hearsay. *Campos*.

"[Trial court]: Sustained."

Later, Sims opined Rhoden was not likely to engage in sexually violent criminal behavior. The following colloquy occurred:

"[Defense counsel]: And, doctor, in forming your opinions and drafting your report did you interview a Mim Ribiero?

"[Sims]: I did.

"[Defense counsel]: And what was her position?

"[Prosecutor]: Objection, your honor. Calls for hearsay, *Campos*.

"[Trial court]: Sustained."

Sims explained his conclusion Rhoden suffered from an extreme antisocial personality disorder was based on Rhoden's inability to conform his behavior to the law, his deceitfulness, his reckless disregard for the safety of others, and his lack of remorse. When defense counsel asked whether there was anything about the website that troubled him, Sims replied, "It just shows kind of bad judgment." When counsel asked whether

23

the website influenced his decision whether Rhoden was likely to reoffend, Sims answered the following: "I find no possible way that that could be the case. I don't think this would affect either criterion -- my opinion on either criterion." Sims explained Rhoden's score of a four on the Static-99R gave him a 12 to 18 percent chance of reoffending after five years. Sims opined Rhoden could safely and effectively be treated in the community.

*Rhoden's Testimony*

Rhoden testified about his criminal history and admitted he raped Tina, Christina, Kathryn, and Kimberly using modeling as a ruse to gain their trust. He admitted raping the girls despite the fact he had an active sex life with his ex-wife and girlfriend and he solicited prostitutes during that time. Rhoden said he was sentenced to prison in Tennessee in 1985 and in California in 1988 and when he was released in 2003, he first went to Orange County Jail and then Coalinga. Rhoden admitted previously lying under oath about his treatment while incarcerated. Rhoden explained his high risk behaviors were "sexual preoccupation, manipulation, sexually objectifying females, [and] not thinking of the consequences of [his] actions around teenage girls." He admitted "they will always be" his high risk behaviors. When the prosecutor asked Rhoden whether he believed he could be around underage girls, Rhoden answered, "No, I can be, but it's not something I want to do, though." Rhoden stated he previously had a gambling addiction, defrauded scores of people, and used many different aliases.

Rhoden admitted he "assisted in creating" the paralegal website in 2012 while he was at Coalinga. He admitted the name on the website, "Donald Allen Rhoden" was not his legal name, the two telephone numbers were to cell phones, and he did not live at the address. He explained lawyers, including Anderson, assisted him with drafting the testimonials. He conceded there was nothing on the website that indicated he was at Coalinga "because [he] deliberately designed it that way to try to keep from people finding out that [he] was - - [his] criminal history and the fact [he] was currently

24

incarcerated." When the prosecutor asked whether he purposefully designed the website to avoid being identified, he replied, "Yes."

On cross-examination, Rhoden testified he had been incarcerated for 30 years and in 2006 he asked to go to Coalinga for treatment. Rhoden stated that if he was released from custody he would register as a sex offender and move to Florida where his family lived. Rhoden said his former attorney, Anderson, had agreed to help him move to Florida. Rhoden testified he accepted responsibility for his sex and theft offenses and attributed them to his preoccupation with sex and gambling addiction. He claimed he had not gambled in 25 years. He said he was ashamed of his conduct and did not blame the victims at all. He explained 15 years of treatment had taught him what his risks were and how to cope with them, including to avoid contact, think about the consequences of his actions, be honest with people, and rely on his support team. He added that he had already arranged for outpatient treatment in Florida and had prepared a community safety plan to ensure he does not reoffend. Rhoden did not believe he would reoffend because he does not want to create any more victims or hurt his family, and he does not want to return to prison, which would be a life sentence. After detailing his treatment history, which included his spiritual conversion, Rhoden stated his drive had decreased with age and he did not have improper fantasies or thoughts.

Rhoden testified he "had a major role in" creating the website with Anderson but he did not have Internet access on his laptop because it was against the rules. He added Coalinga had a law library and computers with Westlaw access. He stated the website accurately reflected his education, training, and experience and the attorney testimonials accurately reflected his work. Rhoden explained he sent out 200 letters to attorneys seeking paralegal work and in the letters disclosed his criminal history and the fact he was at Coalinga. Rhoden changed his name to obscure his past and obtain work and not to defraud anyone. He explained the telephone numbers on the website were to cell phones; Anderson had one and his sister the other. He could access the cell

25

phone messages using the prison telephone. He had earned money as a paralegal. He stated that if he were released he would register as a sex offender under his legal name and petition to have his name changed. On redirect examination, Rhoden testified, "I have a desire to obscure my past as much as possible for business purposes."

*Rhoden's Evidence*

Mim Ribeiro, a licensed clinical social worker, worked at Coalinga with Rhoden during multiple phases of his treatment until she left in December 2012. Ribeiro stated that when she began working with Rhoden in 2007, she did not detect him being deceptive or manipulative. She added that as of the time she left, he had thoroughly and exceptionally completed all his assignments. She knew he had one rule violation for possessing medication, but she was not aware he engaged in any inappropriate behavior. She added that he did not appear to manipulate the staff to expedite his progress through the treatment program. When defense counsel asked her whether she had observed other patients to be manipulative or deceptive, the trial court sustained the prosecutor's relevance objection. Later, defense counsel asked her whether based on her work with Rhoden she made any recommendations, the trial court sustained the prosecutor's objections based on improper opinion and lack of foundation. When asked, Ribeiro stated she was aware of his release plans but she had not reviewed them in six months. When defense counsel asked her whether Rhoden's release plans were credible and not speculative, the trial court sustained the prosecutor's relevance objection.

Timothy Grace, a senior psychologist at Coalinga, was Rhoden's primary facilitator in Phase II from fall 2009 to spring 2011. Grace believed Rhoden had identified his cognitive distortions and learned how to address them. He believed Rhoden understood the damage he had done and empathized with his victims. He stated that because Rhoden had completed Phase IV there was no further treatment that Coalinga could provide for him. Grace opined Rhoden was suitable for and would benefit from outpatient treatment. Grace knew Rhoden created a website that included false

26

information but that did not affect his opinion because the website did not violate any rules and seeking employment was a positive step.

Sheree Riley-Violon, a psychologist at Coalinga since October 2010, worked as Rhoden's Phase III group facilitator from January 2011 through March 2012. Riley-Violon recommended him for advancement into Phase IV because he had demonstrated empathy, recognition of cognitive distortions, and a knowledge of high-risk factors. She did not believe Rhoden was being deceptive. She stated Rhoden had completed the sex offender treatment that was available to him at Coalinga but he could continue in the program for maintenance purposes.

Stephanie Brazier, a clinical psychologist at Coalinga, began working with Rhoden in 2008 when he was in Phase II. Brazier stated Rhoden completed Phase IV and had received all the available treatment at Coalinga for his cognitive distortions. She opined he was amenable to outpatient treatment in the community. She explained the fact Rhoden recognized his cognitive distortions was a significant factor in reducing risk and he will have to deal with them for the rest of his life. She added that through his interactions with young female employees at Coalinga Rhoden demonstrated his ability to deal with his issues. When defense counsel asked Brazier whether Rhoden appeared to be legitimately trying to manage his cognitive distortions, the trial court sustained the prosecutor's objection the question was speculative. Later, defense counsel asked her whether it was her opinion Rhoden's risk of reoffending was low if released. The trial court sustained the prosecutor's objection on the grounds it was an improper opinion and it lacked foundation. When defense counsel asked her about Rhoden's ability to follow Coalinga's rules and regulations, the trial court sustained the prosecutor's objection the question was leading. On cross-examination, Brazier acknowledged Rhoden was not perfect because he broke prison rules. On redirect examination, Brazier explained he violated the rules by possessing over-the-counter medication.

27

Brian Abbott, a licensed clinical social worker and psychologist, testified he interviewed Rhoden in 2006, 2012, and 2013, and reviewed all the relevant records and reports. Abbott concluded Rhoden did not suffer from a mental disorder. He stated Rhoden did not have antisocial personality disorder or personality disorder, NOS, with narcissistic traits or features, because his behavior in the state hospital was inconsistent with either antisocial or narcissistic traits. Assuming he did have those disorders however, Abbott was not of the opinion they would qualify because they do not predispose someone to commit sexually violent acts. The following colloquy occurred:

"[Defense counsel]: Anything further he can do at Coalinga?

"[Prosecutor]: Objection, your honor. Calls for speculation.

"[Trial court]: Sustained.

"[Defense counsel]: Doctor, does . . . Rhoden's hospital file and medical file support a current diagnosis of antisocial personality disorder?

"[Prosecutor]: Objection, your honor. Asked and answered.

"[Trial court]: It calls for hearsay. Sustained.

"[Defense counsel]: Doctor, did you review . . . Starr's current evaluation of . . . Rhoden?

"[Abbott]: I did.

"[Defense counsel]: Do you agree with her diagnosis of personality disorder NOS?

"[Abbott]: I do not.

"[Prosecutor]: Objection. Irrelevant.

"[Trial court]: Sustained.

"[Prosecutor]: Move to strike the answer your honor.

"[Trial court]: The last answer is stricken."

When defense counsel asked Abbott whether Rhoden's behavior at Coalinga supported a diagnosis of personality disorder NOS, the trial court sustained the

28

prosecutor's asked and answered and hearsay objections. Abbott stated the paraphilia NOS non-consent diagnosis had come under scrutiny because it had very little reliability and validity. The following colloquy occurred:

"[Defense counsel]: And Dr. Abbott, in reviewing all the materials in this case, did you review . . . Starr's paraphilia NOS, nonconsent diagnosis?

"[Prosecutor]: Objection. Irrelevant.

"[Trial court]: Overruled.

"[Abbott]: I did review that diagnosis, yes.

"[Defense counsel]: And is there a disagreement with that diagnosis?

"[Prosecutor]: Objection, your honor. Relevance.

"[Trial court]: Sustained. [¶] . . . [¶]

"[Defense counsel]: And are you familiar with the literature that's critical of the use of victim counts in making . . . a [paraphilia nonconsent NOS] diagnosis?

"[Abbott]: Yes.

"[Defense counsel]: And what is your opinion with regard to that literature?

"[Abbott]: Well, the literature takes a look at can victim counts be used to establish a diagnosis of a paraphilia NOS, nonconsent and essentially the literature --

"[Prosecutor]: Objection. Calls for hearsay. *Campos*.

"[Trial court]: Sustained to the portion of the answer. That sounded as though he was going to describe the literature. When he said, 'and essentially the literature,' those words will be stricken. The rest of the answer will remain."

When defense counsel asked Abbott to describe Rhoden's behavior at Coalinga, the trial court sustained the prosecutor's hearsay objection. Defense counsel asked whether Rhoden's conduct and behavior was consistent or inconsistent with a lack of volitional impairment, and the trial court sustained the prosecutor's objection based on a lack of foundation.

Defense counsel questioned Abbott about the relevant actuarial tools, including the SRA-FV, which Abbott testified he did not use because of its poor reliability.  When defense counsel asked him how then a psychologist should present the results from that test, the trial court sustained the prosecutor's objection not because it was speculative but because the answer would be irrelevant.  Defense counsel asked Abbott about standardized assessment protocols, and the following colloquy occurred:

"[Defense counsel]:  Are state evaluators required to follow these assessment procedures for their protocols.

"[Abbott]:  Yes.

"[Defense counsel]:  What is the type of assessment method described in the standardized assessment protocol?

"[Prosecutor]:  Objection, your honor.  Relevance.  Lack of foundation.  Calls for speculation.  [¶] . . . [¶]

"[Trial court]:  The objection is sustained.

"[Defense counsel]:  Doctor, does the standardized assessment protocol provide any information in the literature showing the problems of the clinically adjusted actuarial approach?

"[Abbott]:  No.

"[Defense counsel]:  Would it be important for an evaluator to consider the limitations of this approach when rendering opinions as to whether . . . Rhoden meets the threshold of substantial danger?

"[Prosecutor]:  Objection, your honor.  Calls for speculation.  Relevancy.

"[Trial court]:  Sustained."

Abbott scored Rhoden with a four on the STATIC-99R, which correlated with a 6 percent chance of reoffending over five years.  Abbott added that the reoffense rate decreases as a person ages.  Abbott opined that even if Rhoden had a mental disorder, he was not likely to reoffend.  Abbott explained he reviewed the website and it

30

did not change his opinion because there was no scientific evidence establishing deception was an indicator of a risk of sexual reoffense. Defense counsel returned to the topic of age and the following colloquy occurred:

"[Defense counsel]: Doctor, are you familiar with any studies in literature regarding testosterone and erectile capacity when certain subjects reach a certain age?

"[Abbott]: Yes.

"[Defense counsel]: And when do individuals start having such problems? At what age?

"[Prosecutor]: Objection, your honor. Calls for speculation. Lack of foundation.

"[Trial court]: Sustained.

"[Defense counsel]: Okay. Well, based upon your review of the literature, did you form an opinion as to when men would begin to have these types of problems?

"[Prosecutor]: Objection, your honor. Lack of foundation. Calls for speculation.

"[Trial court]: Sustained. [¶] . . . [¶]

"[Defense counsel]: And based upon your review of the literature, have you been able to form an opinion as to when a male starts having problems maintaining an erection?

"[Prosecutor]: Objection, your honor. Lack of foundation.

"[Trial court]: Sustained."

Abbott opined Rhoden did not meet the criteria for an SVP.

On cross-examination, Abbott admitted he had testified for the prosecution only once before in an SVP case. On redirect examination, the following colloquy occurred:

"[Defense counsel]: Dr. Abbott, you indicated that you're not in a position to determine whether or not . . . Rhoden is at risk of reoffending; is that correct?

31

"[Abbott]:  Correct?

"[Defense counsel]:  That's not one of the criteria under the sexually violent predatory act, is it?

"[Abbott]:  No, it's not.

"[Defense counsel]:  It's whether or not . . . Rhoden is of a substantial risk of sexually reoffending if released to the community without the appropriate care and treatment in a facility correct?

"[Abbott]:  Yes, and specifically a serious and well-founded risk to engage in sexually violent predatory acts.

"[Defense counsel]:  And did you conclude that . . . Rhoden does not pose such a serious and well-founded risk; is that correct?

"[Prosecutor]:  Objection.  Leading.  Asked and answered.

"[Trial court]:  Sustained.

"[Defense counsel]:  What was your opinion?

"[Prosecutor]:  Objection, your honor.  Asked and answered.

"[Trial court]:  Sustained."

Gary Anderson, a lawyer and retired law professor, testified he met Rhoden in 1988, took his case, and got his sentence reduced.  Anderson explained that after Rhoden became a certified paralegal, Rhoden began working for him as a paralegal in the mid-1990s.  When defense counsel asked Anderson to describe the quality of Rhoden's work, the following colloquy occurred:

"[Anderson]:  It's excellent work.

"[Prosecutor]:  Objection.

"[Anderson]:  Superb work.

"[Prosecutor]:  Objection.

"[Trial court]:  Hold on.  There's an objection.

"[Prosecutor]:  Relevance, your honor.

32

"[Trial court]:  Sustained.

"[Prosecutor]:  Move to strike the answer.

"[Trial court]:  The last answer will be stricken."

Anderson stated he is a member of Rhoden's support team and will help him register as a sex offender in California, assist him in getting to Florida, and employ him as a paralegal.  Anderson said he helped Rhoden enroll in the outpatient treatment program in Florida.  Anderson testified he assisted Rhoden in creating the website and recommended Rhoden use an alias because a Google search of Rhoden's legal name produced his criminal history.  Anderson made the recommendation so Rhoden could obtain business and not to defraud anyone.  As to the cell phone numbers on the website, Anderson confirmed he had one of the cell phones and Rhoden's sister had the other.

Raul Amador, Coalinga's Catholic chaplain, worked with Rhoden almost every day.  He stated Rhoden assisted sick and dying patients.

*Verdict & Commitment*

The jury found Rhoden was an SVP.  The trial court ordered Rhoden committed to the custody of the Department of State Hospitals.

DISCUSSION

I.  *Trial Court's Sua Sponte Continuance*

Rhoden argues Judge Luesebrink erred by sua sponte continuing the case. We agree but conclude Rhoden was not prejudiced.

A trial court may continue trial sua sponte upon a finding of good cause. (*People v. Santamaria* (1991) 229 Cal.App.3d 269, 277 (*Santamaria*).)  The decision to continue a case "'must be based upon the facts and circumstances of the case as they exist at the time of the determination.'"  (*Bussard v. Department of Motor Vehicles* (2008) 164 Cal.App.4th 858, 864 (*Bussard*).)  Trial judges are faced with competing interests when deciding whether to continue a case.  "'On the one hand, they are mandated by the Trial Court Delay Reduction Act [citation] to actively assume and maintain control over

33

the pace of litigation. On the other hand, they must abide by the guiding principle of deciding cases on their merits rather than on procedural deficiencies. [Citation.] Such decisions must be made in an atmosphere of substantial justice. When the two policies collide head-on, the strong public policy favoring disposition on the merits outweighs the competing policy favoring judicial efficiency. [Citation.]' [Citation.]" (*Oliveros v. County of Los Angeles* (2004) 120 Cal.App.4th 1389, 1395.)

California Rules of Court, rule 3.1332 (rule 3.1332) addresses continuances and provides that "although continuances of trials are disfavored," a court may grant a continuance for good cause. Rule 3.1332(c) provides a list of factors demonstrating good cause, including the unavailability of an expert witness (rule 3.1332(c)(1)), and significant unanticipated changes in the case's status (rule 3.1332(c)(7)). Rule 3.1332(d) provides other factors a court may consider, including proximity of the trial date (rule 3.1332(d)(1)), the availability of alternative means to address the problem (rule 3.1332(d)(4)), prejudice (rule 3.1332(d)(5)), the court's calendar and impact on other cases (rule 3.1332(d)(7)), and the interests of justice (rule 3.1332(d)(10)).

"The decision to grant or deny a continuance is committed to the sound discretion of the trial court. [Citation.] The trial court's exercise of that discretion will be upheld if it is based on a reasoned judgment and complies with legal principles and policies appropriate to the case before the court. [Citation.] A reviewing court may not disturb the exercise of discretion by a trial court in the absence of a clear abuse thereof appearing in the record. [Citation.] The burden rests on the complaining party to demonstrate from the record that such an abuse has occurred. [Citation.]" (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 984-985.)

Here, we conclude Judge Luesebrink erred by continuing the case for nearly six weeks to ostensibly allow counsel to research whether the matter could be resolved pretrial by motion to dismiss or other manner. A brief recitation of the facts is necessary.

34

On May 1, 2013, the day trial was set to begin in what was expected to be a 10-day trial, defense counsel stated the prosecution had no expert testimony Rhoden was likely to reoffend and defense counsel *orally* moved to dismiss the petition. After Judge Luesebrink analogized the situation to a motion for summary judgment and the prosecutor stated case authority held summary judgment is not available in SVP cases, Judge Luesebrink told counsel to return that afternoon prepared to litigate the issue. When proceedings resumed in the afternoon, Judge Luesebrink explained summary judgment was not available in SVP proceedings but the prosecution would have a difficult time satisfying his burden. At one point Judge Luesebrink asked defense counsel to discuss with Rhoden whether he would waive his speedy trial rights and subsequently said Rhoden had no such right. After Judge Luesebrink told defense counsel to research the issue of whether the case could be resolved pretrial and counsel asked whether the case was proceeding, Judge Luesebrink said he would continue the case. When defense counsel asserted he would rather proceed with trial, Judge Luesebrink discussing judicial efficiency, court backlog, and his scheduled surgery on June 2. Judge Luesebrink sent the case back to Judge Hanson, setting the matter on June 10, 2013, over defense counsel's objections.

Rhoden and the Attorney General dispute the reason for the continuance. Rhoden asserts Judge Luesebrink continued the case because he believed the prosecution could not satisfy its burden. Rhoden thus asserts dismissal was necessary. The Attorney General counters Judge Luesebrink continued the case because Rhoden made his motion to dismiss orally without proper preparation. The Attorney General therefore contends Judge Luesebrink properly continued the case "to make an informed ruling on" Rhoden's motion to continue. We conclude there is some truth in both their assertions but they both fail to acknowledge weaknesses in their contentions.

We agree with Rhoden that Judge Luesebrink was concerned the prosecution could not satisfy its burden of establishing Rhoden was likely to reoffend.

35

And we agree with the Attorney General that Rhoden made an oral motion to dismiss. Thus, because the prosecution did not have an expert who would testify Rhoden was likely to reoffend, Rhoden moved to dismiss the case. But we disagree with Rhoden dismissal was proper, and we disagree with the Attorney General that Judge Luesebrink in part continued the case to make an informed ruling.

Judge Luesebrink could not make an informed ruling on the motion to dismiss because Rhoden did not present any written points and authorities and a short continuance would have been appropriate. (*Bussard, supra,* 164 Cal.App.4th at p. 865 [unexpected development justifies continuance].) However, Judge Luesebrink did not continue the case so he could make an informed ruling on Rhoden's motion to dismiss in a reasonable period of time. He continued the case for almost six weeks, sending it back to Judge Hanson and setting a date of June 10, 2013. That was error. *Santamaria, supra,* 229 Cal.App.3d 269, is instructive.

In *Santamaria*, there was an 11-day suspension of jury deliberations due to the judge's scheduled vacation. The court found no good cause for the suspension, stating the following: "The record in the present case discloses no administrative duties, congested calendar, or any other exceptional circumstances to explain the continuance; instead, the record indicates only that the judge was to be 'away,' and that at least two of the days involved were holidays." (*Santamaria, supra,* 229 Cal.App.3d at p. 277.) The court was also concerned with the timing of the suspension because it occurred during jury deliberations. (*Id.* at pp. 277-278.) Finally, the court noted there was an alternative to suspending deliberations—substituting another judge. (*Id.* at p. 278.)

We agree a trial judge may sua sponte continue a case for good cause such as when an expert witness is unavailable or to address a significant change in the case's status. We also agree a trial judge may consider a number of factors such as judicial efficiency, the court's backlog of cases, and the interests of justice. But here

36

Judge Luesebrink did not simply trail the case for a few days, or until the following week, to allow counsel to submit written points and authorities on the motion to dismiss. Citing to judicial efficiency, other concerns, and his own knee surgery in early June, Judge Luesebrink sent the case back to Judge Hanson and set a date nearly six weeks out. Although he cited to a congested calendar, like the judge in *Santamaria*, Judge Luesebrink also seemed concerned with his personal schedule. Also like in *Santamaria*, there was an alternative. Had Judge Luesebrink trailed the case until the following week, the case would have certainly been completed by the end of the month based on the 10-day trial estimate. Thus, we conclude Judge Luesebrink erred by sua sponte continuing the case almost six weeks.

However, we conclude Rhoden was not prejudiced by the continuance. Rhoden concedes we review the error under the harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). "[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error. [Citation.] Prejudice under *Watson* 'must necessarily be based upon reasonable probabilities rather than upon mere possibilities.' [Citation.]" (*People v. Mena* (2012) 54 Cal.4th 146, 162.)

Rhoden argues the continuance prejudiced him for the following three reasons: (1) instead of trial beginning on May 1, and Starr testifying, presumably on May 16, that Rhoden was not likely to reoffend, trial was delayed over a month during which time the prosecutor informed Starr of Rhoden's website and Starr changed her opinion to conclude Rhoden was likely to reoffend; (2) Judge Luesebrink, whose comments indicated he was concerned with the prosecution satisfying its burden of proof, would have ruled more favorably than Judge Hanson; and (3) the undue delay was in itself prejudicial. Based on the entire record, we conclude Rhoden did not establish it was reasonably probable he would have obtained a more favorable result had Judge Luesebrink not sua sponte continued the case.

37

Rhoden points to nothing in the record, and we found nothing, that demonstrates the prosecutor would not have learned of Rhoden's paralegal website had trial commenced on May 1, 2013, and Starr testified on May 16, 2013. When trial did start on June 24, 2013, the prosecutor informed the trial court he found the website the previous Thursday and informed Starr of the website. Based on the prosecutor's representations to the court, we can conclude that as part of its trial preparation the prosecution was performing its due diligence on Rhoden in anticipation of examining Starr. The prosecution would have performed the same due diligence had trial started in May in anticipation of examining Starr on May 16, 2013, the date the prosecutor indicated she would be available to testify. We disagree with Rhoden the continuance until June was the reason the prosecution learned of Rhoden's website.

Rhoden argues principles of judicial estoppel prohibit the Attorney General from arguing on appeal the prosecution would have had an expert witness, Starr, who would testify Rhoden was likely to reoffend because at trial, the prosecutor conceded Starr would testify he was not likely to reoffend. Judicial estoppel is inapplicable here.

Judicial estoppel is applicable when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' [Citations.]" (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986-987.) The gravamen of Rhoden's claim is the prosecutor took a position, Starr would not testify Rhoden was likely to reoffend, the prosecutor's position was successful, and the trial court granted a continuance. The problem is the prosecution did not seek the continuance. Judge Luesebrink granted a continuance sua sponte. Thus, contrary to Rhoden's claim, the prosecution did not successfully assert a position to obtain a continuance.

38

Rhoden relies on two cases *People v. Litmon* (2008) 162 Cal.App.4th 383 (*Litmon*), and *People v. Jacobs* (2007) 156 Cal.App.4th 728 (*Jacobs*), to argue he was prejudiced.  Both are inapposite.

In *Jacobs*, the trial judge would have been available in two court days for defendant's sentencing hearing, but the court denied defendant's request for a short continuance to have the hearing in front of the trial judge because of jail overcrowding.  (*Jacobs, supra,* 156 Cal.App.4th at pp. 731-733.)  A different judge imposed the sentence on defendant, and defendant contended the trial judge could have given him a more lenient sentence.  (*Id*. at p. 740.)  When reversing, the court acknowledged defendant's argument it was reasonably probable the trial judge would have been more lenient involved "an element of speculation[,]" because the court was "'unable to say what the position'" of the trial judge would have been.  (*Ibid*.)  Here, it is too speculative to conclude Judge Luesebrink would have ruled more favorably than Judge Hanson on Rhoden's motion to dismiss.  As we explain below, such a remedy is not available.

In *Litmon*, defendant filed a motion to dismiss the pending recommitment petition after trial was continued to a date beyond the expiration of the two-year commitment period, claiming violation of his rights to due process and a speedy trial.  (*Litmon, supra,* 162 Cal.App.4th at pp. 392-393.)  The trial court denied the motion on the ground there was no right to a speedy trial under the Sexually Violent Predators Act (SVPA).  (*Ibid*.)  Trial was scheduled to begin in March 2007, after the effective date of the new law permitting indeterminate terms of commitment.  (*Id*. at p. 394.)  On appeal, the court engaged in an in-depth analysis of the SVPA and the meaning of due process, concluding defendant had the right to due process in the context of proceedings under the SVPA, and the two-month delay due to systemic government problems violated that right.  (*Id*. at pp. 399-406.)  The court concluded the trial court erred by denying his motion to dismiss.  (*Id*. at p. 406.)  Here, Rhoden did not argue his procedural due process rights were violated.  Additionally, Rhoden contributed to the delay by orally

39

moving to dismiss the case, which was the impetus for Judge Luesebrink continuing the case. Thus, although we conclude Judge Luesebrink erred by continuing the case, we conclude Rhoden was not prejudiced.

## II. Motion to Dismiss

Rhoden asserts Judge Hanson erred by denying his nonstatutory motion to dismiss. We disagree.

In *Bagration, supra,* 110 Cal.App.4th at page 1689, the court concluded Code of Civil Procedure section 437c does not operate in SVPA proceedings. In that case, the offender brought a motion for summary judgment asserting his criminal convictions did not qualify as sexually violent offenses necessary to file a commitment petition. (*Bagration, supra,* 110 Cal.App.4th at p. 1681.) After the trial court denied the summary judgment motion, the offender sought a writ of a mandate. (*Id.* at p. 1682.) In denying the writ petition, the court explained Code of Civil Procedure section 437c is located in part 2 of the Code of Civil Procedure which, as the California Supreme Court had held, did not generally extend to a special proceeding (such as an SVPA commitment proceeding) unless expressly incorporated by the statutes establishing the special proceeding. (*Bagration, supra,* 110 Cal.App.4th at p. 1685.) The SVPA did not expressly incorporate part 2 of the Code of Civil Procedure, and thus, summary judgment was not permitted in an SVPA commitment proceeding. (*Bagration, supra,* 110 Cal.App.4th at pp. 1685-1686.) To allow incorporation of summary judgment into SVPA proceedings would "potentially supplant [the SVPA]'s probable cause hearing and trial." (*Id.* at p. 1688.)

The *Bagration* court concluded although Code of Civil Procedure section 437c, subdivision (a), provides summary judgment is available in "any . . . proceeding," section 437c "is inherently inconsistent with the [SVPA] because the *mutual* summary procedures set forth in Code of Civil Procedure section 437c, if applied to [SVPA] proceedings, would allow an individual to be adjudicated a sexually violent predator

40

without benefit of the required beyond a reasonable doubt burden of proof and, in the case of a jury trial, a unanimous verdict-impairing the requirements that are at the heart of the statute's due process protections." (*Bagration, supra,* 110 Cal.App.4th at pp. 1688-1689.) Finally, in rejecting petitioner's claim criminal law allows nonstatutory procedural motions, the *Bagration* court distinguished *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888 (*Ghilotti*), which authorized trial court's to review expert evaluations for facial material legal error before filing of the petition. (*Bagration, supra,* 110 Cal.App.4th at p. 1689.) Finally, the court concluded petitioner was not without a remedy as habeas corpus was available. (*Ibid.*)

Contrary to Rhoden's assertion *Bagration* "was badly flawed," we agree with *Bagration's* well reasoned analysis and conclude Judge Hanson properly denied the nonstatutory motion to dismiss, which was in essence a motion for summary judgment. Rhoden claims Judge Hanson should have ruled on the merits because his nonstatutory motion to dismiss was in the alternative a petition for writ of habeas corpus. His claim is belied by the record. At the hearing, Judge Hanson noted Rhoden had alternatively titled his written submission, nonstatutory motion to dismiss and petition for writ of habeas corpus and questioned whether counsel had properly alleged a habeas corpus petition. When Judge Hanson inquired whether the motion "[wa]s truly just a nonstatutory motion to dismiss[,]" counsel answered, "Yes."

Our conclusion neither summary judgment nor a nonstatutory motion to dismiss is available in SVP proceedings is further supported by *Gray v. Superior Court* (2002) 95 Cal.App.4th 322. In *Gray*, the court explained: "Once a petition under the Act has been filed, and the trial court (as here) has found probable cause to exist, the matter should proceed to trial. In other words, once a petition has been properly filed and the court has obtained jurisdiction, the question of whether a person is a sexually violent predator should be left to the trier of fact *unless* the prosecuting attorney is satisfied that proceedings should be abandoned." (*Id*. at p. 329; see *People v. Superior Court* (*Salter*)

41

(2011) 192 Cal.App.4th 1352, 1359 (*Salter*) [citing *Gray* in mentally disordered offender case].)  Both *Bagration* and *Gray* compel the conclusion Judge Hanson properly ruled on Rhoden's nonstatutory motion to dismiss, which alleged insufficient evidence.  Rhoden did not allege there was a material legal error, a point he concedes, and thus his reliance on *Reilly v. Superior Court* (2013) 57 Cal.4th 641, and *Ghilotti, supra,* 27 Cal.4th 888, are misplaced.

Rhoden again relies on *Litmon, supra,* 162 Cal.App.4th 383, to argue a motion to dismiss is available in SVP proceedings.  As we explain above, the *Litmon* court reversed the trial court's denial of petitioner's motion to dismiss because a two-month delay violated petitioner's procedural due process rights.  (*Litmon, supra,* 162 Cal.App.4th at pp. 392-393.)  Again, Rhoden did not argue his procedural due process rights were violated below.  On appeal, Rhoden asserts such a claim could only be made on appeal.  We disagree, as defense counsel could have argued before Judge Luesebrink and/or Judge Hanson that any delay violated his procedural due process rights.  He did not.  More importantly, any delay could be attributed in part to Rhoden's oral motion to dismiss before Judge Luesebrink.

Finally, Rhoden relies on three cases concerning mentally disordered offenders to argue dismissal was proper.  Neither *Salter, supra,* 192 Cal.App.4th at page 1359 [prosecutor entitled to jury trial when conflicting medical opinions in mentally disordered offender (MDO) proceedings], *People v. Sheek* (2004) 122 Cal.App.4th 1606, 1611-1612 [trial court may grant dispositive pretrial motions pursuant to court's inherent power to conduct orderly proceedings in MDO case], nor *People v. Cosgrove* (2002) 100 Cal.App.4th 1266, 1275 [defendant statutory right to jury trial unless waived in MDO proceedings], compels us to depart from the *Bagration* court's reasoning.  Thus, we conclude Judge Hanson properly denied Rhoden's nonstatutory motion to dismiss.

42

*III. Sufficiency of the Evidence*

Rhoden contends insufficient evidence supports the jury's finding he was an SVP because Starr's testimony, specifically her newfound opinion he was likely to reoffend, was unreasonable.  Not so.

"In reviewing the sufficiency of the evidence to support a person's civil commitment as an SVP, we apply the substantial evidence standard of review.  [Citation.] 'Under this standard, the court "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on "'isolated bits of evidence.'"' [Citation.]  [¶]  We 'must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]  'We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citation.]  Further, '[a]lthough we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' [Citation.]  This is true even in the context of expert witness testimony.  'The credibility of the experts and their conclusions [are] matters [to be] resolved . . . by the jury,' and '[w]e are not free to reweigh or reinterpret [that] evidence.' [Citation.]" (*People v. Poulsom* (2013) 213 Cal.App.4th 501, 518 (*Poulsom*).)

The SVPA authorizes a person to be civilly committed as an SVP if (1) the offender has been convicted of a qualifying sexually violent offense; (2) the offender has

43

a diagnosable mental disorder; and (3) the mental disorder makes it likely he will engage in sexually violent criminal conduct if released.  (*In re Lemanuel C.* (2007) 41 Cal.4th 33, 42, fn. omitted.)  The testimony of a single expert witness constitutes sufficient evidence.  (*People v. Bowers* (2006) 145 Cal.App.4th 870, 879; *People v. Scott* (2002) 100 Cal.App.4th 1060, 1064.)  However, opinion testimony that is speculative or conjectural is not sufficient evidence.  (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)  "[A]n expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based.  [Citations.]"  (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510.)

Rhoden acknowledges Starr's testimony generally "would be impossible to attack . . . as not constituting substantial evidence."  However, he asserts her testimony is subject to attack because the reasons and assumptions underlying her change of opinion were unreasonable.  His complaints all concern the creation of and the information on the website, i.e., he did not improperly access the Internet, he did not improperly possess cell phones, his use of an alias was on the advice of counsel to acquire business, and his use of a fake address was a reasonable business decision.  Although the short answer to Rhoden's contentions is these were matters for the jury to decide when assessing Starr's opinion (*People v. Smithey* (1999) 20 Cal.4th 936, 966 [jurors must weigh expert opinion based on qualifications and believability, reasons for opinion, and matter upon which it is based]), we will explain why Starr's change of opinion, and the reasons underlying her opinion, were reasonable, credible, and of solid value.

Contrary to Rhoden's claim otherwise, Starr did not change her opinion based entirely on her belief he illegally accessed the Internet and possessed cell phones.  Starr testified that beginning in 2003 she evaluated Rhoden seven times and each time concluded he was likely to reoffend and thus was an SVP, the most recent time being in 2012.  Starr added she evaluated Rhoden again in 2013 and concluded he was not likely

to reoffend. Despite the fact she concluded he was not likely to reoffend, both her January 2013 report and her testimony indicate she still had concerns with Rhoden's state of mind. Although her report was not admitted into evidence and we do not consider it for its evidentiary value, her report provides context for her testimony.

In her report, Starr stated Rhoden had "a history of being deceitful and extremely manipulative." Starr said that although Rhoden admitted gambling was a high risk factor that led to commission of the sexual offenses, in 2005 he asked his wife to buy him lottery tickets with specific numbers and told her that when he was released they would go to the dog racing track. Starr commended Rhoden on his immediate participation in sex offender treatment upon his arrival at Coalinga, although she was of the opinion Rhoden manipulated staff to advance him through the phases without satisfying the requirements and to advocate on his behalf. Starr concluded, "Given the totality of the aforementioned considerations, *in spite of continued concerns*, there is no documented evidence that would indicate he is likely to commit future sexually violent predatory acts." (Italics added.)

Starr expressed the same concerns during her testimony. Although Starr believed Rhoden violated Coalinga rules by accessing the Internet and possessing cell phones, she also noted he had used aliases in the past and he was using an alias again on the website. She opined this demonstrated a "continuing pattern of his deceitfulness, his manipulation, [and] his arrogance." At various times, Starr repeated Rhoden's use of an alias, when he had previously used them, and his use of a false address, demonstrated his deceit. She explained her belief Rhoden manipulated and deceived his treatment team at Coalinga was validated by his creation of the website, and she opined, he has "gamed . . . the system." Starr opined the deceit and manipulation were relevant to the mental disorder diagnosis in how he lured the victims into his car under the pretense he was a professional photographer. Starr stated that although she concluded Rhoden was not an

45

SVP in January 2013, "[her] gut feeling was that there was still something nefarious going on and that he met the criteria, but [she] had no evidence of . . . that."

Based on this evidence, the jury could reasonably conclude Starr's opinion Rhoden was likely to reoffend, and the reasons and assumptions underlying her change of opinion, were reasonable. The record is clear that even in January 2013 when Starr changed her opinion to conclude Rhoden was not likely to reoffend, she had concerns he was still engaging in deceitful and manipulative conduct. Although Rhoden contends it was pure speculation he violated the Coalinga rules, the evidence demonstrated he employed Anderson and his sister to create the appearance he was a paralegal who lived in the community.

Starr opined Rhoden used deceit and manipulation to lure his victims, and she suspected Rhoden used deceit and manipulation to influence Coalinga staff. Her concerns were confirmed in June 2013 when she learned of the website with the alias and false address. Starr testified deceit and manipulation were a component of Rhoden's mental disorder and his mental disorder led him to commit sexual offenses. Thus, Starr's change of opinion were not based on her "imagination," as Rhoden asserts, but instead on over 10 years of evaluating Rhoden and the newly discovered website. Because we conclude Starr's underlying assumptions and conclusions were reasonable, Starr's opinion Rhoden was likely to reoffend was reasonable, credible, and of solid value and therefore there was sufficient evidence supporting the jury's verdict Rhoden was an SVP.

Citing to Starr's "gut feeling" of "nefarious activity," Rhoden claims Starr changed her opinion because she was biased against him. As we explain above, Starr's change of opinion was based on her long treatment history of Rhoden and newly discovered evidence. Additionally, defense counsel cross-examined Starr extensively about the reason she changed her opinion and whether it was based on solid reasons. There was ample evidence, including Starr's testimony, from which the jury could have rejected Starr's opinion. Finally, Rhoden cites to some of that evidence, including

46

Abbott's testimony there was no scientific evidence establishing a correlation between deception and risk of sexual reoffending, to argue Starr's testimony was unreasonable. That was for the jury to decide. (*Poulsom, supra,* 213 Cal.App.4th at p. 518 [experts' credibility and conclusions issues for trier of fact].) Therefore, we conclude there was sufficient evidence supporting the jury's verdict Rhoden was an SVP.

## IV. Evidentiary Rulings

Rhoden argues there were about 46 evidentiary errors he separates into three categories. We address his claims below.

"We review the trial court's evidentiary rulings for abuse of discretion. [Citations.] . . . [¶] . . . Only relevant evidence is admissible. [Citation.] Relevant evidence is broadly defined as that having a 'tendency in reason to prove or disprove any disputed fact that is of consequence' to resolving the case. [Citation.] Inferences drawn from the evidence must be logical and reasonable, not merely speculative. [Citations.] All relevant evidence is admissible, unless a specific statutory or constitutional provision bars its admission. [Citations.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405, fn. omitted.)

## A. Campos

Rhoden contends the trial court made nine evidentiary errors when, during defense counsel's cross-examination of Starr and Sims, the court sustained the prosecutor's *Campos* objections. He also asserts the court erred when on direct examination of Abbott, the court sustained the prosecutor's *Campos* objection. As we explain below, we agree in part with his claims but conclude he was not prejudiced.

In *Campos*, defendant was certified by the Department of Corrections as an MDO, and petitioned for a jury trial to challenge that certification. At trial, the prosecution called a psychiatrist to testify concerning defendant's mental health. Relying in part on the reports of other medical personnel, the expert opined defendant met the MDO criteria and testified other medical personnel agreed with her. (*Campos, supra,*

47

32 Cal.App.4th at p. 307.)  A jury found defendant to be an MDO.  (*Id*. at p. 306.)  On appeal, defendant argued the nontestifying experts' conclusions were inadmissible hearsay.  (*Id*. at p. 307.)  The *Campos* court held the expert was properly allowed to testify she relied on reports in forming her opinions, but the trial court erred "when it allowed her to reveal their content on direct examination by testifying that each prior medical evaluation agreed with her own opinion."  (*Id*. at p. 308.)

The *Campos* court explained:  "Psychiatrists, like other expert witnesses, are entitled to rely upon reliable hearsay, including the statements of the patient and other treating professionals, in forming their opinion concerning a patient's mental state.  [Citations.]  On direct examination, the expert witness may state the reasons for his or her opinion, and testify that reports prepared by other experts were a basis for that opinion.  [Citation.]  [¶]  An expert witness may not, on direct examination, reveal the content of reports prepared or opinions expressed by nontestifying experts.  ""'The reason for this is obvious.  The opportunity of cross-examining the other doctors as to the basis for their opinion, etc., is denied the party as to whom the testimony is adverse.'""  [Citations.]  This rule does not preclude the cross-examination of an expert witness on the content of such reports. . . . '[P]rocedurally, if an expert does rely in part upon the opinions of others, the expert may be cross-examined as to the content of those opinions.  It is improper, however, to solicit the information on direct examination if the statements are inadmissible.  [Citations.]'"  (*Campos, supra,* 32 Cal.App.4th at pp. 307-308.)

In his opening brief, Rhoden provides a list of nine rulings he asserts the trial court got wrong based on *Campos*.  Rhoden does not address each piece of evidence separately in his opening brief.  Instead, he argues generally the court erred by sustaining the prosecutor's objections because *Campos* concerned eliciting hearsay statements during the direct examination of an expert witness whereas here we are concerned with cross-examination.

To raise a proper challenge to the trial court's evidentiary rulings, Rhoden was required to "demonstrate how each ruling was erroneous" and "support such challenge with reasoned argument and citations to authority." (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1074 (*Salas*).) He failed to do that in his opening brief and on that ground we may dismiss his claims as forfeited. In his reply brief however, Rhoden separately, and exhaustively, addresses each of the nine rulings. We do not consider arguments made for the first time in a reply brief. (*People v. Zamudio* (2008) 43 Cal.4th 327, 353 (*Zamudio*).) However, we will address the merits of his claims to prevent the inevitable ineffective assistance of counsel claim.

As to the merits of these claims, we dispose of two claims at the outset. We need not address Starr's testimony concerning Grace (relevance), and Sims' testimony regarding Ribeiro (speculative), because the prosecutor did not make a *Campos* objection to defense counsel's questions. (*People v. Fuiava* (2012) 53 Cal.4th 622, 689 [defendant must have objected on specific grounds asserted as error on appeal].)

With respect to his other seven assertions of error during cross-examination of the prosecution's witnesses, we agree with Rhoden. As we explain above, *Campos* prohibits an expert witness from testifying on direct examination concerning the opinions of nontestifying experts or contents of reports. The *Campos* court excluded from its prohibition the cross-examination of an expert witness concerning such matters. (*Campos, supra,* 32 Cal.App.4th at pp. 307-308.) Here, the court's rulings all occurred during defense counsel's cross-examination of Starr and Sims, and thus, we conclude *Campos* was inapplicable. The evidence in question may have been inadmissible for other reasons, but it was not inadmissible pursuant to *Campos*.

As to Rhoden's contention the trial court erred by sustaining the prosecutor's *Campos* objection to Abbott's attempt to testify concerning contents of literature critical of the paraphilia NOS diagnosis, we disagree. Expert testimony on direct examination concerning the contents of reports was the type of evidence the

49

*Campos* court held was inadmissible. (*Campos, supra,* 32 Cal.App.4th at pp. 307-308.) Thus, Rhoden's claim is meritless. We will discuss the prejudicial effect, if any, of the trial court's rulings below.

## B. General Evidentiary Arguments

Rhoden contends the trial court made numerous evidentiary errors throughout the trial when the court overruled his objections during Starr's testimony and sustained the prosecutor's objections during his witnesses' testimony (Ribeiro, Brazier, Abbott, & Anderson). The essence of his contention is the trial court applied a different standard of admissibility to the prosecution's evidence than it did to his evidence. In other words, Rhoden complains the trial court was biased in favor of the prosecution and the court's rulings restricted his ability to present a defense.

Rhoden provides a list of 36 claims of alleged error. But once again, Rhoden fails to separately analyze each of the claims. Indeed, he admits in his opening brief, "Rather than analyze each of the objections listed above individually, this argument will focus on general categories of the trial court's rulings and show how the trial court erred or made inconsistent rulings in each of the various areas." He then proceeds to categorizes the trial court's rulings under three categories, "Speculation and Foundation," "Biased Rulings," and "Relevance." Because he proceeds in this manner, it is difficult to discern the basis for the alleged errors. (Cal. Rules of Court, rule 8.204(a)(1)(B) ["[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"].) We can reject his contentions on this ground alone. (*Salas, supra,* 198 Cal.App.4th at p. 1074.) Rhoden's failure to provide any legal reasoning or analysis on each individual evidentiary objection results in a waiver of his claims. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [it is not the role of reviewing court to independently seek out support for appellant's conclusory assertions, and such contentions may be rejected without consideration]; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 546 [appellate court need not

speculate on what legal argument could be asserted and treat matter as waived].) That Rhoden supplies some reasoning on a handful of objections is inadequate. In his reply brief, he takes a more detailed approach and addresses some of the rulings separately. Again, we need not address claims made for the first time in a reply brief. (*Zamudio, supra,* 43 Cal.4th at p. 353.)

To forestall a claim of ineffective assistance of counsel, we will briefly discuss why we are not persuaded the 36 claims of evidentiary error, even if they were well-founded, are not a basis for reversing the judgment. In the first sentence of his analysis section, Rhoden concedes "some of the variance in the admissibility [of rulings] was probably due to the tendency of [the prosecutor] to make more technical objections—especially on asked and answered grounds—than did [defense counsel]." We agree.

The record demonstrates defense counsel had a practice of citing a litany of objections, rather than articulating a clear and specific objection. Illustrative of defense counsel's lack of precision is the following that occurred when Starr was discussing the website and cell phone use:

"[Starr]: And so just shows me he's doing what he's always done. On the surface try to look like a good guy or justify why he's okay, but underneath --

"[Defense counsel]: Objection. Calls for speculation and lack of foundation. Move to strike."

Significant to Starr's opinion was the fact Rhoden engaged in a continued pattern of deceitfulness and failure to comply with rules. There was no element of speculation as to whether Rhoden, admittedly through an intermediary, had a website or had used cell phones. Starr had seen the website and had listened to the message on the cell phones to determine Rhoden's activities. She was not speculating when she explained how the website and cell phone activity supported her opinion. Nor can we discern what element of the "foundation" was lacking with respect to this testimony.

51

Rhoden next asserts the "vast majority of various evidentiary rulings were in response to speculation and foundation objections." We do not disagree. As we discuss above, defense counsel seemed to favor these objections and used them liberally. But we are not persuaded the trial court erroneously denied many of Rhoden's speculation and lack of foundation objections. He cites the court's failure to sustain his objection when Starr testified she had never seen a patient at any state hospital have a website. Starr was not speculating when she stated what her observations had been regarding patient websites. Nor can we conclude there was a lack of foundation for her to testify what she had or had not observed. In reviewing many of the other allegations of error with respect to speculation and foundation objections, we reach similar conclusions.

This does not mean we conclude the trial court never erred in its evidentiary rulings. Clearly a close examination of the countless evidentiary rulings the court made did reveal some instances of error. This leads us to Rhoden's next broad claim of bias.

As an example, Rhoden cites the trial court's insistence Starr be allowed to answer an open-ended question indefinitely unless defense counsel agreed to withdraw his question. We agree Starr's answer had become a narrative with no question pending. When Starr provided a brief answer the court interrupted and advised Starr that counsel had asked her to relate every statement Rhoden had made. The court indicated it would allow Starr to continue unless defense counsel withdrew his question. We agree it was improper for the court to interject itself in this manner, but rather than state an objection, defense counsel was silent and simply indicated he did not want to withdraw his question. This exchange does not establish the trial court was biased.

Rhoden also argues the trial court repeatedly erred in ruling on relevance objections. Again, we agree the record reflects erroneous rulings in response to some relevance objections, but we do not agree these errors were a result of any scheme by the court to deprive Rhoden of the opportunity to present favorable evidence.

52

Rhoden cites the trial court's exclusion of evidence about the favorable testimonials on the website as to Rhoden's performance as a paralegal. Rhoden asserts he should have been allowed to question Starr as to whether she had any actual evidence the favorable statements on the website were false. Rhoden misses the point in two respects. First, the testimonials about Rhoden's competence as a paralegal were not relevant to whether he was an SVP. Second, the deception Starr was focused on was Rhoden's. That an individual other than Rhoden opined falsely as to Rhoden's ability as a paralegal would not be relevant to whether Rhoden was deceitful. Even if this line of questioning was remotely relevant, we fail to see how opinions of Rhoden's prowess as a paralegal—truthful or not—were sufficiently relevant that their exclusion would be error.

We have reviewed the evidentiary errors individually and cumulatively to determine whether there is evidence of bias. We conclude there is no pattern of error that would support a finding of bias, and the trial court did not restrict Rhoden's right to present a defense. We will discuss the prejudicial effect, if any, of the trial court's rulings anon.

C. *Sex Offender Treatment Program*

Rhoden asserts the trial court erred by excluding evidence of his "progress in the sex offender treatment program." (Emphasis omitted.) Acknowledging evidence of the consequences of the jury's verdict is inadmissible, Rhoden argues evidence he was "ready" for CONREP was relevant and admissible to the issue of whether he was likely to be a danger to the community. We disagree.

In *People v. Rains* (1999) 75 Cal.App.4th 1165, 1169-1170 (*Rains*), the court concluded the consequences of a "'true'" finding on whether a defendant is an SVP has no relevance to any issue to be decided by the jury. Again, to determine whether a person is an SVP, the jury must decide whether the person has a qualifying offense, has a diagnosed mental disorder, and is likely to reoffend. The jury is not tasked with deciding whether the person is eligible for CONREP. Welfare and Institutions Code section 6608

53

authorizes a person who has already been committed as an SVP to petition the court for CONREP after one year of commitment. (Welf. & Inst. Code, § 6608, subds. (a), (f) & (g).) Needless to say, this is not the procedural posture of this case as Rhoden had not yet been committed as an SVP. Rhoden complains such a conclusion "is hyper-technical nonsense." No, it is the application of the ordinary rules of evidence. For this reason, Rhoden's reliance on *People v. Smith* (2013) 216 Cal.App.4th 947, which involved a petition for conditional release pursuant to Welfare and Institutions Code section 6608, subdivisions (a) and (c), is misplaced.

Rhoden draws the distinction between being "ready" for CONREP and being "eligible" for CONREP, and contends the fact he is technically ineligible does not compel the conclusion evidence he was ready for CONREP was inadmissible. He contends evidence he was ready for CONREP tended to establish he was ready for treatment in the community. In exercising its discretion, the trial court concluded otherwise but permitted Rhoden to offer evidence of his treatment progress, which he did at length through Ribeiro's, Grace's, Riley-Violin's, and Brazier's testimony he had completed treatment at Coalinga. We disagree with Rhoden it was simply a matter of offering evidence he was ready for CONREP and evidence of the "technical legal requirements" of CONREP was unnecessary. Evidence of Rhoden's readiness for CONREP without further explanation as to its role in the SVP system would serve only to confuse the jury and consume additional time.

Rhoden's final complaint is that CONREP is not an immediate consequence of the jury's verdict because the person has to wait one year before petitioning the court and it is voluntary. Although CONREP is not the only consequence of the jury's verdict because a person may decide not to petition for CONREP, it is a possible consequence. And although a person may not petition for CONREP and thus not "volunteer," CONREP is a "state-operated forensic conditional release program[.]" (Welf. & Inst. Code, § 6608, subd. (h).) Therefore, CONREP is akin to the

54

conservatorship treatment in *People v. Calderon* (2004) 124 Cal.App.4th 80, 89-91 [following *Rains* and drawing distinction between voluntary and involuntary treatment in interpreting *Ghilotti*]. Thus, we conclude the trial court properly excluded any evidence of CONREP. We now discuss whether Rhoden was prejudiced by any evidentiary errors.

*D. Prejudice*

Above, we find the trial court made several evidentiary errors, but we conclude they were not prejudicial because it was not reasonably probable Rhoden would have obtained a more favorable result absent the evidentiary errors. (*People v. Samuels* (2005) 36 Cal.4th 96, 113-114 (*Samuels*) [state law evidentiary errors tested by *Watson* standard of prejudice].)

Rhoden concedes none of the alleged evidentiary errors individually were prejudicial but instead argues they were cumulatively prejudicial. He also concedes "the only real issue at [his] trial was the reliability of Starr's claim that [he] was dangerous." Based on our review of the record, and Rhoden's concessions, including that had Starr not changed her mind any attack on the sufficiency of the evidence would be "impossible," we conclude this case turned on the issue of how the jury perceived Starr's change of opinion on the eve of trial.

With respect to Rhoden's claim the trial court crippled his cross-examination of the prosecution's witnesses, particularly Starr, and prevented him from undermining her credibility, we disagree. Most of the evidence Rhoden complains was improperly excluded pursuant to *Campos* concerned whether Rhoden had a mental disorder and not whether he was likely to reoffend. As to the other evidence excluded pursuant to *Campos*, the jury heard Brazier's opinion Rhoden could be safely released and testimony from other Coalinga staff that Rhoden completed sex offender treatment and was a model prisoner. Thus, the evidence excluded pursuant to *Campos* was at best tangentially relevant to the primary issue—whether Rhoden was likely to reoffend.

55

On that issue, Starr agreed with the defense's witnesses, Grace, Riley-Violon, and Brazier, that Rhoden was not likely to reoffend until the eve of trial. However, she changed her opinion after viewing Rhoden's paralegal website. Defense counsel cross-examined Starr thoroughly on the fact she changed her opinion, why she changed her opinion, and that her newfound opinion was entirely speculative. Starr testified the primary reason she changed her opinion was because Rhoden used an alias and a false business address. Defense counsel cross-examined Starr exhaustively about the significance of that evidence when compared with the fact Rhoden was a certified paralegal with over 20 years of experience. Thus, we conclude defense counsel did an admirable job of cross-examining Starr on her then recent change of opinion. Had the jury been concerned with Starr's change of opinion, it had ample evidence upon which to reject her opinion as not credible.

As to Rhoden's assertions the trial court's rulings bolstered Starr's credibility and undermined his witnesses' credibility with the jury, again we disagree. Rhoden points to nothing in the record, and we found nothing, to support his claim the trial court was biased against him. (*Samuels, supra,* 36 Cal.4th at pp. 120-121.) Rhoden's witnesses testified at length about his successful progress in sex offender treatment while at Coalinga and their opinion he was suitable for treatment in the community. Additionally, the trial court instructed the jury it was not to speculate as to why it ruled on evidentiary objections as it did. Therefore, Rhoden has not demonstrated the trial court was biased against him.

One final thought. Starr examined Rhoden eight times over the course of 10 years. Each of those times she concluded Rhoden was likely to reoffend and was an SVP, except in January 2013. Perhaps it would be different if for 10 years Starr opined Rhoden was not likely to reoffend and then on the eve of trial changed her opinion based solely on the website. Her change of opinion in July 2013 back to her original opinion was not the sea change Rhoden makes it out to be. We also conclude the trial court's

evidentiary rulings did not violate Rhoden's due process right to a fair trial.  (*People v. Benavides* (2005) 35 Cal.4th 69, 91 [violations of state evidentiary rules generally do not rise to level of due process violations].)

*V.  Cumulative Error*

Rhoden claims there was cumulative prejudicial error.  We have concluded Judge Luesebrink erred by continuing the case and Judge Hanson erred in several of her evidentiary rulings.  We have concluded the errors individually were not prejudicial.  We now conclude they were not cumulatively prejudicial for the reasons stated above.  Thus, Rhoden's claim is meritless.

DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.